In re Robert E. MORTON, Jr., Debtor.

Betty J. GUNTER, Plaintiff,

v.

Robert E. MORTON, Jr., Defendant.

Bankruptcy No. 87–09855.
Adv. No. 88–0008A.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

March 15, 1989.

Glen Galbaugh, Decatur, Ga., for plaintiff.

Bill Parker, Bill Parker and Associates, Atlanta, Ga., for defendant.

## MEMORANDUM OF OPINION AND ORDER

JOYCE BIHARY, Bankruptcy Judge.

The plaintiff filed a complaint seeking a determination that a $75,000.00 judgment debt in favor of the plaintiff is not dischargeable in bankruptcy under 11 U.S.C. § 523(a)(6). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I). A trial was held on this matter on February 1, 1989, and the Court gave counsel an opportunity to file post-trial briefs. After considering all of the testimony and the evidence presented, argument of counsel, and the post-trial brief filed by plaintiff,[1] the Court makes the following findings of fact and conclusions of law.

The debt in question arises out of a judgment entered by the State Court of Gwinnett County on November 23, 1987 against the defendant-debtor Robert E. Morton, Jr. ("Mr. Morton" or "defendant") and in favor of the plaintiff Betty J. Gunter ("Ms. Gunter" or "plaintiff") in the amount of $75,000.00, with interest at the rate of 12% per annum, and costs. The state court case went to the jury on three counts: (1) that on December 31, 1983, Mr. Morton pointed a loaded gun at Ms. Gunter's head and threatened to kill her, resulting in the plaintiff suffering great mental anguish; (2) that on June 3, 1984, Mr. Morton struck Ms. Gunter repeatedly about the head and choked her, and that as a result of that conduct, she suffered physical bruises and great mental anguish; and (3) that on June 3, 1984, Mr. Morton shot Ms. Gunter in the shoulder with a gun which resulted in both mental and physical injuries. Gwinnett County Transcript at 195. The charges to the jury included a charge on ordinary negligence, a charge on assault and battery, and charges on damages including punitive and exemplary damages. The judgment was based upon a general jury verdict which stated as follows: "[w]e the jury, find for the plaintiff the sum of $75,000.00." The defendant did not appeal from the judgment.

On December 14, 1987, the defendant filed a petition under Chapter 7 of the Bankruptcy Code. The plaintiff seeks to have this Court declare the judgment debt nondischargeable pursuant to 11 U.S.C. § 523(a)(6) which excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity". 11 U.S.C. § 523(a)(6).

The general form of the verdict and the charges given to the jury preclude any finding here that that jury verdict was based on a finding of "willful" and "malicious" conduct within the meaning of § 523(a)(6). Accordingly, neither party could prevail in this action on the basis of collateral estoppel.[2]

The events giving rise to the plaintiff's claim took place on two days, New Year's Eve, 1983, and June 3, 1984. The parties' testimony as to what transpired on both of those days was markedly different.

The only undisputed material facts about the events of December 31, 1983 are that Ms. Gunter and Mr. Morton went for a drive in Mr. Morton's car in the early evening, that they stopped at a nearby cemetery for some time, and that Mr. Morton fired a gun while at the cemetery.

Ms. Gunter testified that she had told Mr. Morton she would not spend New Year's Eve with him. Mr. Morton nonetheless came to her home in the early evening, and Ms. Gunter's daughter Lyn, who

---

1. The defendant did not file a post-trial brief.

2. Indeed, the plaintiff did not move for summary judgment on the basis of collateral estoppel, and the defendant's motion for summary judgment was denied. See Order entered October 21, 1988.

Defendant's counsel vigorously argued at trial that plaintiff's failure to litigate the issues of malice and willfulness in the state court action are fatal to this dischargeability case. That argument is without merit. See Brown v. Felsen, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

was then fifteen years old, told Mr. Morton her mother was not home. Mr. Morton started to tear the door down, and Lyn screamed for her mother. Afraid that he would break the glass in the door, Ms. Gunter went outside to see if she could calm him down.

Ms. Gunter testified that Mr. Morton then forced her to get in his car at gunpoint. This testimony was corroborated by Lyn. Mr. Morton then started driving, turned into a cemetery and parked the car. Ms. Gunter testified that Mr. Morton held the gun to her head and clicked the gun. She nervously said this is a "hell of a way" to play a joke on someone. He responded by firing the gun out the window to prove to her that there were bullets in the gun. Mr. Morton then asked her if she was ready to die, and she promised that if he would let her live, she would "honor and obey" him. Mr. Morton made her promise not to tell anybody about the incident. She continued seeing Mr. Morton after that night, but explained that she was afraid of him.

In contrast, Mr. Morton testified that Ms. Gunter voluntarily got into his car and that she suggested he pull into the cemetery. He denied threatening her or holding the gun to her head, and said he fired the gun only to see if it worked.

The parties also disagree as to most of what transpired on June 3, 1984. Mr. Morton had been at Ms. Gunter's that day. Ms. Gunter testified that Mr. Morton left to go to the store, but she called his ex-wife's residence and found he was there. When Mr. Morton returned to Ms. Gunter's home, they argued and he choked her, beat her, and knocked her head. She ran to the back bedroom and called her friend, June Lemmond, for help. When she thought that Mr. Morton had left, she ran to a neighbor's house but returned home soon and found that Ms. Lemmond had arrived. Ms. Gunter and Ms. Lemmond went to Ms. Lemmond's house to get a key to Ms. Gunter's house. They had a drink there and then returned to Ms. Gunter's home where they searched unsuccessfully for Ms. Gunter's handbag. Ms. Lemmond left and Ms.

Gunter went to sleep, but awoke to her daughter's knocking on the door and to the telephone ringing. After Lyn entered the house, Ms. Gunter heard more knocking at the door, and this was Mr. Morton. Ms. Gunter and Lyn tried to ignore him and be still, but he got into the house. Mr. Morton entered the house holding Ms. Gunter's handbag in one hand, which he was holding in front of his chest, and he had a gun in his other hand. Mr. Morton reminded Ms. Gunter that he told her he would get her. He came at her with the gun pointed at her head, she threw up her hands and said "don't shoot me", and he shot her in the shoulder.

Ms. Gunter's daughter Lyn testified that she was walking towards the kitchen when she saw Mr. Morton walking in the house with her mother's handbag in one hand. She turned and walked back to her bedroom when she heard her mother screaming "no, Bobby, don't do it". She then heard a gun go off and ran into the kitchen to find her mother on the floor. Lyn further testified that Mr. Morton then turned to her and threatened to shoot her as well, at which time she jumped under the kitchen table. Mr. Morton did not attempt to rebut this testimony. A few minutes later, Mr. Morton told Lyn to call an ambulance, and he put the gun down.

In stark contrast to Ms. Gunter's testimony and that of her daughter Lyn, Mr. Morton testified that he came into Ms. Gunter's house late on June 3, 1984 to return her handbag, which she had left in his car. He testified that he was carrying the gun because he always brought his gun into Ms. Gunter's house at night to protect her from a possible break-in. Both Ms. Gunter and Lyn emphatically denied that Mr. Morton ever brought a gun into the house or kept a gun with him in the house when he stayed overnight. Mr. Morton said that the gun went off in the midst of a scuffle between him and Ms. Gunter, which he said she initiated.

Defendant testified that Ms. Gunter only pursued the state court action after he left her. Defendant argued that Ms. Gunter's continuation of her relationship with him

both after the New Year's Eve incident and after the June 3, 1984 shooting, along with her dismissal of a previous civil suit and criminal charge against him arising out of the same matters, show that she pursued this claim only out of revenge. Ms. Gunter explains that she wanted to end the relationship, that she was terrified of Mr. Morton, and that her dismissal of a previous civil suit and her willingness to drop criminal charges were motivated by her fear of Mr. Morton.

It is impossible to reconcile the parties' versions of what took place on either New Year's Eve or the day of the shooting. This dischargeability action, like the state court case, turns on the credibility of the witnesses. The Court finds the plaintiff's testimony and that of her daughter Lyn and friend Ms. Lemmond to be credible and consistent, whereas the defendant's explanations were evasive and unsatisfactory and were, in several instances, different than the answers and explanations given by the defendant before the jury in the state court case. Defendant's testimony was inconsistent and equivocal on his disposition of the gun after June 3, 1984, how he happened to have plaintiff's handbag the night of June 3, 1984, the location of the holster for the gun, and his consultation with the attorney who drafted a dismissal of a previous civil suit for the plaintiff to sign.

■ The defendant's main defense was that the shooting was an accident. While the ultimate questions here of willfulness and maliciousness were not necessary to the jury verdict in this case, the issue of whether the June 3, 1984 shooting was an accident was actually litigated and necessary to the state court verdict. The jury was charged that Mr. Morton contended that Ms. Gunter's injuries were the result of an accident and that if the jury found that the plaintiff's damages, if any, were caused by an accident, then the plaintiff could not recover damages. Gwinnett County Transcript at 198–199. The jury awarded the plaintiff damages of $75,000.00, and thus the jury necessarily found that the shooting was not accidental.

Thus, collateral estoppel bars relitigation of this issue by the defendant, and this Court is precluded from finding that the shooting was accidental. Furthermore, even if collateral estoppel did not apply to the defense of accident, the Court finds after carefully considering all the testimony, the demeanor of the witnesses, and the probability of the testimony, that the shooting was not accidental.

■ Section 523(a)(6) of the Bankruptcy Code renders any debt "for willful and malicious injury by the debtor to another entity" nondischargeable. 11 U.S.C. § 523(a)(6). The term "willful" means intentional and deliberate, see *Chrysler Credit Corporation v. Rebhan (In re Rebhan)*, 842 F.2d 1257, 1264 (11th Cir.1988); *Sunco Sales, Inc. v. Latch (In re Latch)*, 820 F.2d 1163, 1166 n. 4 (11th Cir.1987), and "malicious" means wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill will. *Sunco Sales*, 820 F.2d at 1166 n. 4. A finding of reckless disregard will not satisfy the "willful" requirement, but is sufficient to establish malice, and malice can be implied or constructive. *Chrysler Credit*, 842 F.2d at 1263. A party seeking to except a debt from discharge under § 523(a)(6) must prove willfulness and maliciousness by clear and convincing evidence. *Chrysler Credit*, 842 F.2d at 1262; *Chang v. Daniels (In re Daniels)*, 91 B.R. 981 (Bankr.M.D.Fla.1988).

■ While it would be an overstatement to say that all injuries from gunshot wounds are the result of willful and malicious conduct within the meaning of § 523(a)(6), shootings which are not accidental and not in self-defense are generally deliberate and malicious, and liabilities arising from an assault and battery generally involve willful and malicious acts. *See Smith v. Pitner (In re Pitner)*, 696 F.2d 447, 448–449 (6th Cir.1982); *Blackman v. Gaebler (In re Gaebler)*, 88 B.R. 62 (E.D. Pa.1988); *Oswald v. Gonsor (In re Gonsor)*, 95 B.R. 123, 18 B.C.D. 986 (Bankr.D.S. D.1988); *Dixon v. Wilson (In re Wilson)*, 49 B.R. 952 (Bankr.M.D.Ala.1985); *Frey v. Beach (In re Beach)*, 39 B.R. 56 (Bankr.W.

D.Ky.1984); *Asplin v. Mueller (In re Mueller)*, 34 B.R. 869 (Bankr.D.Colo.1983).

■ The plaintiff has proven by clear and convincing evidence that the defendant's conduct which gave rise to the claim was willful and malicious. The assaults and batteries here are intentional torts and the conduct was deliberate. Defendant intentionally pulled the trigger when he shot the plaintiff on June 3, 1984, so the shooting was willful. Defendant knew that an injury would be caused by discharging the gun pointed at the plaintiff, and yet proceeded to shoot the gun despite such knowledge. This is sufficient to establish malice within the meaning of § 523(a)(6). Similarly, holding a loaded gun to plaintiff's head and threatening her on New Year's Eve and striking plaintiff on June 3, 1984 were wrongful and intentional acts done without just cause or excuse. Accordingly, the judgment awarded to the plaintiff in state court is nondischargeable pursuant to § 523(a)(6).

■ The Court is aware that the amount of the jury award will place a heavy financial burden upon the defendant. However, the liability and amount of the debt have already been determined, and this Court cannot alter that amount. While defendant seemed to argue at the trial that this Court could and should reduce the amount awarded by the jury, defendant failed to submit any brief or cite any law to the Court on this point. The Court's own review of the case law suggests that generally, the amount of the state court judgment cannot be attacked in the bankruptcy court dischargeability action. *Comer v. Comer (In re Comer)*, 723 F.2d 737 (9th Cir.1984); *Stazio v. Hogan (In re Hogan)*, 47 B.R. 124 (Bankr.W.D.Wis.1985); *Roesing v. Moccio (In re Moccio)*, 41 B.R. 268 (Bankr.D.N.J. 1984); *Brown v. Sachs (In re Brown)*, 56 B.R. 954, 959 (Bankr.E.D.Mich.1986).

In accordance with the above reasoning, it is the order of the Court that the debt owed by defendant to plaintiff arising out of the judgment in the amount of $75,000.00 plus interest and costs entered by the State Court of Gwinnett County, Georgia, on November 23, 1987, be, and the same hereby is, nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

Finally, defendant filed a counterclaim alleging that the adversary proceeding was brought to harass the defendant and was calculated to cause the defendant unnecessary trouble and expense. Defendant did not pursue the counterclaim at trial and, in light of the reasoning herein, the relief sought by the defendant is denied.

IT IS SO ORDERED.