**In re Wilbur L. CORNNER, Debtor.**

**Rodney C. PORTERFIELD and Cathy C. Porterfield, Plaintiffs,**

v.

**Wilbur L. CORNNER, Defendant.**

**Bankruptcy No. 94–00111–BGC–7. Adv. No. 94–00115.**

United States Bankruptcy Court, N.D. Alabama, Southern Division.

Aug. 18, 1995.

Jackson Perkins, Birmingham, Alabama, for Plaintiffs.

Rodger Smitherman, Birmingham, Alabama, for Defendant–Debtor.

James G. Henderson, Trustee.

### MEMORANDUM OPINION

BENJAMIN COHEN, Bankruptcy Judge.

This matter came before the Court for trial on the *Complaint to Determine Dischargeability of Debt* filed by Mr. Rodney C. Porterfield and Mrs. Cathy C. Porterfield. Mrs. Cathy C. Porterfield, one of the plaintiffs, Mr. Wilbur L. Cornner, the defendant, Mr. C. Jackson Perkins, the attorney for the plaintiff, and Mr. Rodger M. Smitherman, the attorney for the defendant, appeared. The matter was submitted on the testimony offered, the exhibits admitted into evidence, the record in the case and the arguments of counsel.

### I. FINDINGS OF FACT

#### A. TESTIMONY OF MRS. PORTERFIELD

Mrs. Porterfield testified that she first met Mr. Cornner in late December 1992. At the time, she and her husband were in financial difficulty and her mortgage holder was about to foreclose on their home. The foreclosure sale was scheduled for January 7, 1993. Her lawyer knew a person at USA Mortgage named Demetria Doughty. He recommended that Mrs. Porterfield go to USA Mortgage and said that if anyone could help their situation, it would be USA. She spoke with Ms. Doughty on the phone. Ms. Doughty instructed her to talk with Wilbur Cornner, who was employed at USA at that time. That evening she met with Mr. Cornner at his office and explained the situation to him. Mr. Cornner told her that he could get investors to go with him to the foreclosure sale and buy her house back at that sale.

BancBoston, the holder of the Porterfields' mortgage, purchased the property at the foreclosure sale. Mrs. Porterfield did not attend the sale. The day after the sale, Mr. Cornner called her at work. He told Mrs. Porterfield that he did not purchase the house at the sale and asked that she and her husband come to his office. Mrs. Porterfield talked with Mr. Cornner many times that day, intermittently, on the telephone from work and, along with her husband, met with Mr. Cornner that day. Mr. Cornner told Mr. and Mrs. Porterfield that BancBoston purchased the house at the sale but that he was going to get investors to redeem the house from BancBoston. Mrs. Porterfield told Mr. Cornner that she was going to have to do something in the next three days or lose the house. Mr. Cornner told her that since he was going to get an investor to buy the house, he did not see any need for them moving out of the house and that they should just stay in the house.

Thereafter, Mrs. Porterfield continued to have conversations with Mr. Cornner about what he could do to keep her in the house. He reassured her repeatedly that completion of the necessary arrangements was imminent, that he was going to "close the deal" within the next hour, or the next two hours, or the next twenty four hours. She took off work for two weeks in January to wait on Mr. Cornner to do something. She refused to give him any money until he provided her with a written agreement. As time passed, Mrs. Porterfield went to Mr. Cornner numerous times and told him that if he could not work out something that she needed to do something else. Mr. Cornner kept telling her that something was going to be worked out within the next few hours. He told Mrs. Porterfield "to have trust and the Lord would provide a way."

Mr. Cornner told Mrs. Porterfield that he needed money to get the investor, but was unspecific as to the amount needed, indicating that it should be as much as she could "come up with." Mrs. Porterfield "came up with" $4,000. On February 16, 1993, Mr. Cornner wrote the following document, entitled Agreement:

Between Wilbur L. Cornner and Cathy C. Porterfield in reference to the property at 1148 Circle Trail; On this day Cathy C. Porterfield did give to Wilbur L. Cornner ($4000.00) four thousand dollars to total secure 1148 Circle Trail for her only. With the understanding that if she decides not to complete the agreed upon arrangements and decides not to get the house her funds would be returned to her less expenses in acquiring 1148 Circle Trail for her and family.

Within (30) days or less Cathy C. Porterfield will complete all agreed upon arrangements and have in hand a lease, purchase agreement for 1148 Circle Trail. At which time she will continue to take care of said property in her best ability.

Cathy C. Porterfield notified 2–16–93.

Pla.Ex. No. 5.

Mr. Cornner signed the document and gave it to Mrs. Porterfield. In return, Mrs. Porterfield gave Mr. Cornner a cashier's check for $4,000. Pla.Ex. No. 4. Mrs. Porterfield's understanding was, based on representations made by Mr. Cornner, that she would not be required to pay any more money and that $4,000 would be her complete financial obligation under the agreement. She understood the "agreed upon arrangements" and the language of the instrument, to refer to Mr. Cornner's leasing of the house back to her. She understood the agreement to require only her general, nonfinancial cooperation and participation in the transaction that Mr. Cornner had purportedly arranged.

Mr. Cornner did not obtain an investor to redeem Mrs. Porterfield's home from Banc-Boston or otherwise arrange for Mrs. Porterfield to get her home back. Mrs. Porterfield finally realized that Mr. Cornner had not arranged for her to get back her home when the sheriff served her with an eviction notice in May 1993. The day after the sheriff came to her house, Mrs. Porterfield called for Mr. Cornner at USA. The secretary at USA told Mrs. Porterfield that Mr. Cornner was no longer employed there and was working out of his home. Mrs. Porterfield went to Mr. Cornner's house. Mr. Cornner told her that he was still working on getting her house back, but didn't tell her anything more defi-

nite. Mrs. Porterfield asked for her money back. Mr. Cornner told her that he had the money in escrow and that he was going to give it back to her. Mrs. Porterfield called Ms. Doughty and told her what had happened. Doughty told Mrs. Porterfield that she did not know anything about the transaction or the $4,000 and said that Mr. Cornner was not working at USA anymore. Mrs. Porterfield went to USA but Doughty refused to see her. Mr. Cornner did not return the $4,000 to Mrs. Porterfield.

Mrs. Porterfield filed a state court lawsuit against Mr. Cornner which resulted in a default judgment in the amount of $40,000. The certificate of judgment, Mrs. Porterfield's state court complaint, and the affidavit filed by Mrs. Porterfield in support of her application for default were introduced into evidence in this case. Pla.Ex. Nos. 1, 2, and 8. The complaint alleges that Mr. Cornner procured $4,000 from Mrs. Porterfield by means of actual fraud. The affidavit contains facts in support of that allegation which are virtually identical to those testified to by Mrs. Porterfield in this proceeding.

## B. MR. CORNNER'S TESTIMONY

In contrast to Mrs. Porterfield's logical rendition of facts, the answers given by Mr. Cornner to the questions propounded to him were, for the most part vague and confusing. Mr. Cornner's testimony, which consists primarily of broad assertions unsupported by detail was self contradictory and ripe with caveats and disclaimers. Mr. Cornner's testimony was difficult to understand. His rambling manner of testifying illustrated a clear purpose of evasion and exhibited a lack of candor. For those reasons this Court places little weight on Mr. Cornner's testimony, except to the extent that his testimony supports or is consistent with the allegations made by Mrs. Porterfield.

Any attempt to specifically describe Mr. Cornner's factual contentions would require the assumption of facts not clearly established by his testimony, and would risk adding detail and structure otherwise not present in his testimony. However, Mr. Cornner's contentions appear to be that: (a) he actually arranged for one or more investors or lenders to purchase Mrs. Porterfield's home from BancBoston and to lease it back to her; and (b) he told Mrs. Porterfield that the investors or lenders would require a $6,500 payment to perform the transaction; and (c) Mrs. Porterfield was aware that she would be required to pay $6,500 well before she gave him the $4,000 on February 16, 1993; and (d) since Mrs. Porterfield was only able to raise $4,000, he was in turn unable to complete his end of the bargain; and (e) he gave half of the $4,000 received by him from Mrs. Porterfield to USA Mortgage as reimbursement for business expenses related to the transaction and spent the remainder of the money on business expenses incurred by him personally in working on the transaction for Mrs. Porterfield.

Mr. Cornner described the $6,500 as ten percent of the amount that would be necessary to buy the house. He was adamant that the amount was not set by him, but was set by the investors or lenders. He also said that the $4,000 paid by Mrs. Porterfield was a portion of the $6,500, and, that after paying the $4,000, Mrs. Porterfield was only required to pay $2,500 more in order to complete the transaction. Until Mrs. Porterfield paid the additional $2,500, Mr. Cornner was, according to his testimony, supposed to hold the money already paid.[1]

According to the foreclosure deed, BancBoston bid $73,255.22 to purchase Mrs. Porterfield's home. Pla.Ex. No. 6. Obviously, $6,500 is not 10% of the amount that would be necessary for an investor or lender to

---

1. The later two points were made by the following colloquy between Mr. Cornner and the Court:
   Q. [by the Court] "So the $4000 that she brought you was a portion of the $6500?"
   A. "That was needed ..."
   Q. [by the Court] "That was needed that you were to keep for her to bring in the other $2500?"

   A. "O.K., I was basically holding it, it was in a holding situation, your Honor, until she brought in the balance of the money."
   No official transcript was made of the proceedings had at the trial. Official recordings of the testimony were made by the bankruptcy court clerk. Those recordings were reviewed by the Court in drafting this opinion.

redeem the property from BancBoston. Furthermore, since Mr. Cornner spent the money paid to him by Mrs. Porterfield, there would not be $6,500 to pay to the mythical lender or investor, even if Mrs. Porterfield had been able to raise the remaining $2,500. Simple mathematics, as well as Mr. Cornner's contradictory actions regarding the money paid him by Mrs. Porterfield, belies Mr. Cornner's testimony that $6,500 was a figure communicated to him by a lender or investor, and, consequently, belies his testimony that he told Mrs. Porterfield that she had to come up with $6,500.

Had Mr. Cornner actually told Mrs. Porterfield that $6,500 was the amount necessary to complete the transaction, logic dictates that the fact that $2,500 remained to be paid by Mrs. Porterfield would have been reflected in the agreement written by Mr. Cornner. Mr. Cornner, however, makes issue of the language of the agreement which refers to the completion of certain "arrangements" by Mrs. Porterfield. He seems to claim that the "arrangements" included the payment of the additional $2,500 and says that the reason he did not specifically refer to the $2,500 in the agreement was because Mrs. Porterfield already knew that an additional $2,500 would have to be paid.[2] But why would Mrs. Porterfield have paid $4,000, and why would Mr. Cornner have accepted that amount, if $6,500 was the amount required by Mr. Cornner? There is no apparent reason and Mr. Cornner's testimony indicates no benefit or advantage that Mrs. Porterfield might have gained by making a partial payment. Therefore, the actions of the parties, as well as the language of the agreement, clearly support Mrs. Porterfield's understanding that payment of the $4,000 was to complete her financial obligation under the arrangement. Her testimony that Mr. Cornner never told her that she would have to pay $6,500 in order to get her house back, is equally supported.

When first asked what he did with Mrs. Porterfield's $4,000, Mr. Cornner stated "I applied that to some expenses that I had incurred from dealing with Mr. and Mrs. Porterfield previously when we had what was a verbal agreement that they did not adhere to and also continued to use those funds to make further phone calls and everything to get a loan for them on their property, and that's it." He testified further that he paid some of those expenses in cash and some by check, but could not remember what bank he was using at the time. He was later asked if he had given any of the money to USA Mortgage, to which he responded "part of the money to my knowledge, definitely was invested in, I know $2000 of it was spent in the company," and explained that he gave the money to USA Mortgage "[t]o be spent for expenses on behalf of USA Mortgage Home Equity." When asked if he cashed Mrs. Porterfield's cashier's check, Mr. Cornner answered "I wrote a, okay, I cashed the check and I know I wrote a check on it cause I wanted to keep, keep something for my records to make sure that if I needed a copy of it in some form to substantiate it later on even if I didn't have it I could, I'm sure, I know, it stays on the bank microfilm for five years or whatever, so I know. . . ."[3] When asked if he deposited the check into his personal bank account, Mr. Cornner stated "No, sir, I, okay, I can't tell you, I mean I know it might sound crazy, but at this point in time, I can't tell you exactly how the funds were disbursed, but I can tell you to the best of my knowledge that a minimum of $2000 was sent into the company, USA Mortgage Home Equity."

On cross examination, Mr. Cornner admitted that in a deposition taken in connection with another adversary proceeding filed against him he had testified that he kept the entire $4,000 received by him from Mrs. Porterfield and paid none of it to USA Mortgage. The following is the specific colloquy which appears in the excerpt from Mr. Corn-

---

2. Mr. Cornner was asked the following question: "Why in your agreement with Mrs. Porterfield didn't you make any reference to $6500?" He responded: "Because she was knowledgeable of the amount needed from the beginning. So I, so the reason I didn't because it was given that she knew."

3. The signal ". . . ." appears to denote an interruption in the witness's testimony.

ner's deposition, which was offered and admitted into evidence:

> Question: "Of this four thousand dollars that you got from Kathy, how much of that did you get to keep?"
>
> Answer: "Kathy Porterfield? Talking about—
>
> Question: "Of the four grand that you got up front.
>
> Answer: "I will say that I was responsible for all of it."
>
> Question: "Okay. You didn't pay any to USA Mortgage or Home Equity? You kept it all?"
>
> Answer: "I—okay. I wouldn't say I paid any to them, no, sir."

Pla.Ex. No. 7 at 60.

Mr. Cornner attempted to explain away the apparent contradiction between the testimony given by him on direct examination and the testimony given in his deposition. Specifically, he was asked whether the deposition testimony was correct or whether his trial testimony was correct, to which he responded "Well, that's correct and what I told you is correct, I didn't pay any to them, I mean it wasn't paid to them, O.K., but I wrote a check for $2000 which went into the company funds basically for expenses, but I didn't just pay them, I mean, you know, and that's the same thing I told you earlier, but, and what I said, I didn't just, I wouldn't say paid it to them, no, so I'm saying the same thing." [4]

Mr. Cornner could not remember how the money was spent with any degree of specificity. When asked what he did with the funds that he retained, he stated "I had made some faxes and some long distance phone calls from my house and I had gotten some preliminaries on the property that I paid for." Other than long distance phone calls, faxes,

and "preliminaries," Mr. Cornner did not describe any other expenses purportedly incurred by him on behalf of Mrs. Porterfield, but could only say that he did not spend the money for personal expenses.

When asked to explain what a "preliminary" was, Mr. Cornner explained "as far as approximate value of the property, I know various appraisers, and I asked them, I said will you go into your computer and give me an approximate value and asked them what would a full blown appraisal cost, and to just answer some preliminaries, what it would cost." He said that he got two "preliminaries" on Mrs. Porterfield's home and paid $75 to $50 in cash for each of them.

Mr. Cornner was unable to remember the number or duration of phone calls and faxes he made and received in connection with Mrs. Porterfield's loan or to provide any sort of itemization of money spent on phone calls and faxes. When asked how much of the money retained by him was spent on long distance phone calls related to Mrs. Porterfield's transaction, Mr. Cornner stated "I can't specifically say, because each time I made a long distance phone call I didn't create a log saying this phone call is for A and this long distance phone call is for B." When asked to itemize the long distance phone calls made by him on behalf of Mrs. Porterfield, Mr. Cornner stated "I made several out of town long distance phone calls speaking in reference to their situations and getting them a mortgage." When pressed for the names of the persons and companies that he called long distance for Mrs. Porterfield, he stated "Off the top of my head I can not give you, you know, the specific mortgage companies at this time, I mean I can't tell you who I called on a certain date a year and a half later." When asked how much of Mrs.

---

**4.** It is noted that in the trial had in Adversary Proceeding No. 94–00111, another dischargeability complaint where Mrs. Porterfield testified on behalf of the plaintiff, Mr. Cornner testified on direct examination that he was never paid anything as a result of his efforts to obtain a loan for Mrs. Porterfield. On cross examination, Mr. Cornner admitted that in a deposition taken in connection with that case, he had testified that he kept the entire $4,000 received by him from Mrs. Porterfield and paid none of it to USA Mortgage. Faced with the contradiction be-

tween the testimony given by him on direct examination and the testimony given in his deposition, Mr. Cornner admitted that he kept all of the money paid to him by Mrs. Porterfield. The Court has not, however, considered the testimony given by Mr. Cornner on the subject in A.P. No. 94–00111, although that testimony is in making the determinations necessary to decide the issues herein, clearly contradictory to the testimony given by him on the subject at the trial of this case.

Porterfield's money was spent by him on long distance phone calls, Mr. Cornner stated "I'm gonna say at this time I do not know how exactly how much I used." When asked how much of Mrs. Porterfield's money was spent by him on faxing documents, Mr. Cornner responded "At this time I can say I don't know the full extent of what I was spending so for me to give you a specific answer to that, I don't know."

Mr. Cornner's deposition testimony clearly indicates that he did not pay any of the $4,000 received by him from Mrs. Porterfield to USA Mortgage. Mr. Cornner's attempt, on a purely semantic basis, to distinguish the testimony given by him at trial with the deposition testimony is unpersuasive. His inability to explain the discrepancy, coupled with the fact that when first asked at trial to account for the money paid to him by Mrs. Porterfield, Mr. Cornner did not say that he gave any portion of it to USA Mortgage, casts substantial doubt on Mr. Cornner's contention that he shared half of the $4,000 with USA Mortgage, which, of course, would explain why Ms. Doughty told Mrs. Porterfield that she didn't know anything about the $4,000.

Mr. Cornner's contention that he spent Mrs. Porterfield's $4,000 on long distance phone calls and faxes is unreasonable and, absent considerable supporting testimony which Mr. Cornner did not provide, is something to which this Court should attribute little weight. Furthermore, Mr. Cornner's inability or refusal to put forth even a minute effort to account for Mrs. Porterfield's money prevents this Court from having any confidence in Mr. Cornner's contention that he spent the money on any sort of business expenses related to his arrangement with Mrs. Porterfield.

The transparency of Mr. Cornner's testimony regarding the $6,500 and the $4,000, makes it very difficult to believe that Mr. Cornner made any effort to save Mrs. Porterfield's home. In addition, Mr. Cornner's testimony on the subject was inherently weak.

Mr. Cornner described in general terms the "deal" which he believed that he had arranged with an investor and a lender whereby the investor or lender would purchase Mrs. Porterfield's home from Banc-Boston and then lease the house to Mrs. Porterfield for a year and give her the option to purchase the house at the end of the lease term. Mr. Cornner, however, related none of the significant details of the purported transaction, such as the total that would be necessary to redeem the property from BancBoston; or Mrs. Porterfield's total financial obligation under the transaction; or the amount of Mrs. Porterfield's monthly rent payments; or the purchase price that Mrs. Porterfield would be required to pay for the house at the end of the lease term; or to what extent the investor or lender would be financing the purchase of the house; or the number of years the purchase price would be financed; or the rate of interest to finance the house. Also, he wavered on the purchase option portion of the deal, as if it was not a sure thing, saying "I had also talked to several companies that said that if she would make the payments on time and, you know, kept cancelled checks and receipts and everything to substantiate that matter then they would entertain the idea, it was like a 90 to 95% chance that they would, you know, redo the mortgage solely into her name," and "The mortgage company agree that the Porterfield loan could be refinanced with a 90 to 95% of getting it refinanced provided, and I told them that the Porterfield situation would be a lease purchase for 12 months and I had also explained that she worked for South Central Bell and she had a good stable job and good stable income and given all those specifications on her, her being Ms. Porterfield, the mortgage company saw no problems with it."

On another confusing point, Mr. Cornner testified paradoxically that the lease purchase payments would be made to the investor or lender who purchased the property, but that Mrs. Porterfield would have to reproduce cancelled checks and receipts to substantiate that the payments were all made on time in order for the investor or mortgage company to agree to finance Mrs. Porterfield's purchase of the home. The Court asked Mr. Cornner who the lease purchase payments would be paid to and he responded

"Those payments would go to the lender, the lender that bought the property or, I'll say the investor or lender that bought the property." When asked why Mrs. Porterfield would then have to substantiate to the investor or lender that the payments were made on time, he stated "At that time, United would not refinance Ms. Porterfield in the house at the foreclosure. What I was doing was making arrangements where she would maintain the property, the property being her home, and in doing that she would also have a lease purchase agreement on the property."

Mr. Cornner was unspecific about the time when purported conversations with Mrs. Porterfield and the alleged investors and lenders took place and vague regarding the substance of those conversations, as well. He was also clearly reluctant to be pinned down regarding the identity of the purported investors and lenders that he allegedly spoke with or had reached agreements with, in most instances making generic references to "the mortgage company" or "the lender" or "the investor." Illustrative of both points is the following excerpt from Mr. Cornner's narrative about his initial dealings with Mrs. Porterfield:

Okay, to the best of my recollection as far as the chronological order of things, okay, when we first met we talked, I can't say specifically, I'm thinking Mr. Porterfield showed up that day, but I can't say 100% sure that he did, and then explained the situation as the, I told them some of the paperwork and everything that was needed. Okay, so the next few days I'm going to say the next few days I'm going to imagine that they brought it in, I can't say specifically, but I imagine that they brought in what was requested and then later they told me that the house was in foreclosure so I had started making phone calls to different mortgage companies and everything to find out what information I would need from them in order to possibly get them refinanced because at that point in time, there was no way to get a second mortgage. Alright, several companies said that they wouldn't be able to help unless she had, you know, about ten, fifteen, twenty thousand, which, I think after talking to them, I knew at that time that they didn't have. Okay, as things progressed, I was able to get a situation, after to talking to, I think I talked to I believe his name was Jeff (inaudible), an attorney for Bank of Boston, and I also made some long distant phone calls to Bank of Boston trying to get a payoff and also trying to get an agreement for payoff. I did make a, upon getting an approximate figure I think that I had gotten was around sixty-five to seventy thousand or maybe seventy-one thousand.

I talked to Bank of Boston after foreclosure, I talked to the main officer after foreclosure, trying to get a figure that they would accept, because, when I was talking to the Porterfields and had I think I had one lender where, if they had 10% they would go with. I told them that would either total about $6500 and I could get it done. At one point, I think Ms. Porterfield told me that they had most of the money and then something happened and I think it was like Monday or Tuesday when I talked to her and she told me that she had not spoken with or seen her husband in the past two or three days and he (inaudible) the money. I think next time I talked with her in reference to that she said he had spent it. Basically from then on out the majority of the dealings that I had with the property was with Ms. Porterfield. Then, let her know what was needed and to my knowledge she was trying to get everything together to do it. She did inform me that, you know, she was having a few problems but she, you know, was trying to get everything together. After talking back to mortgage company and to the lender and the investor that I had, and talking to both of them, you know, if she would come up with, you know, $6500 then they would do it and I also mentioned to her that they would in turn give her a lease purchase agreement on the house. Which, you know, basically lease it back to her for a year and give her an opportunity to repurchase it. I had also talked to several companies that said that if she would make the payments on time and, you know, kept cancelled checks and re-

ceipts and everything to substantiate that matter then they would entertain the idea, it was like a 90 to 95% chance that they would, you know, redo the mortgage solely into her name. It would be a lease purchase.

Unofficial Transcript of Official Court Recording.

One constant throughout Mr. Cornner's testimony was a man who he identified as Kittren Walker and who purportedly attended the foreclosure sale with Mr. Cornner. From Mr. Cornner's version of the facts, however, it is difficult to ascertain what was his actual relationship with Mr. Walker and to define what was Mr. Walker's actual commitment to the Porterfield transaction. At the outset of Mr. Cornner's testimony, he was extremely reluctant to even disclose Mr. Walker's identity, until he was directed to do so by the Court. At the end of his protracted, and often labored testimony, Mr. Cornner was certain that Mr. Walker was the fulcrum of the entire transaction.

When asked initially if Mr. Walker attended the sale for the purpose of providing the money to purchase Mrs. Porterfield's home, Mr. Cornner stated "Well, I wouldn't say providing me, but he was there to view the sale and see what the price and everything was and if the Porterfields kept their end of the verbal agreement they gave me as far as coming up with the funds then he would help them secure a mortgage." When asked who Mrs. Porterfield would be expected to pay her lease payments to Mr. Cornner stated "Those payments would go to the lender, the lender that bought the property or, I'll say the investor or lender that bought the property. At that point in time it was narrowed down to one investor buying the property, the investor being, I'll use Kit Walker, for example, had he bought the property...." [5] When asked if specifically Mr. Walker was the person he was making arrangements with so that Mrs. Porterfield could keep her property, Mr. Cornner answered, equivocally, "Well, had she come up with the $6500, had Mr. and Mrs. Porterfield come up with $6500 when they were told to, then I'm

99.99% they would be in the property today with a lease purchase agreement with it, well, maybe at this time, they would have had it refinanced in their name." When asked to further explain the arrangements, Mr. Cornner stated "The arrangements were just like I had told Mr. and Mrs. Porterfield that the lender that I was dealing with let me rephrase that, the mortgage company and also the investor that I was dealing with wanted 10% down and I had the investor, I'll use Mr. Walker...." [6] For the sake of clarity, the Court at that point in time interrupted Mr. Cornner to asked if Mr. Walker was indeed "the investor," to which Mr. Cornner responded "He was one of them so I can use him, had agreed that if they, being the Porterfields, came up with the money then a lease purchase agreement as I mentioned in there would be given to them with the understanding they would have the option to purchase the property at the end of the lease agreement." At the end of his testimony, Mr. Cornner was asked again point blank to specify the person or entity who was going to purchase the title to Mrs. Porterfield's home. His response was "The No. 1 person that would have bought the property would have been Kit Walker through mortgage funds that he had, he had I believe to my knowledge, he had spoke to a bank and to a credit union in reference to acquiring the funds." That revelation, of course, begets the question as to why Mr. Cornner had to purportedly spend all of Mrs. Porterfield's money on expenses looking for someone to purchase the title to her home, if Mr. Walker, who was with the program from the outset, was already available to perform that function.

When asked the name of the mortgage company he contacted, Mr. Cornner stated "I'm going to say, I'll use the company name, I know it was two companies, but I don't know which one specifically. It was a mortgage company, it was definitely a mortgage company, but I don't know whether it was Quality Mortgage Co. or United Mortgage Co., that I was speaking to at the time." Then he said "Next I contacted, I'll say, I'm

---

5. The signal "...." appears to denote an interruption in the witness's testimony.

6. The signal "...." appears to denote an interruption in the witness's testimony.

going to say, Quality Mortgage out of California and United Mortgage here in Birmingham were the two companies I was speaking with in reference to getting it redone and one of the two had agreed." Mr. Cornner finally chose between the two when asked what he did when Mrs. Porterfield could not come up with the full $6,500. Mr. Cornner said, that he notified "the mortgage company" and when asked "What mortgage company?" he answered "At the time, okay, United Mortgage here on Valley Avenue was one of the ones that I was dealing with so I notified the manager at United Mortgage Company that she had, you know, brought in $4,000 of the money."

Mr. Cornner admitted that he has never successfully arranged a loan for anyone through Quality Mortgage and could not remember who he had talked to at Quality Mortgage, stating "Okay, I did not speak to a specific individual, I spoke to someone in the loan department as far as mortgages, I didn't have a specific person to call." When asked how many loans he had obtained through United Mortgage, Mr. Cornner stated "I know of possibly one or two this year but I'll say in the past 12 months, it could run from anywhere from 1 to 10 or 1 to 12, but I know of a couple this year, but in the past 12 months it could range anywhere from 2 to 12, I can't, I don't write down say this is number 1 and this is number 2."

### C. MR. DORIAN'S TESTIMONY

The testimony of Mr. Joseph M. Dorian, another of Mr. Cornner's clients, from the trial had in Adversary Proceeding No. 94–00111, was admitted into evidence.[7] Mr. Dorian owned an automobile dealership named Hoover Imports. In 1991 he sought extra operating capital which he believed could improve the profitability of Hoover Imports by making it more flexible. Mr. Dorian testified that although Hoover Imports was not having financial problems, he needed from $200,-000 to $300,000 to operate at the level of profitability he desired. At that time, Mr. Dorian had lines of credit at Central Bank and SouthTrust Bank and his credit history and rating were excellent, but he could not convince either SouthTrust or Central to increase his credit lines.

Five or six months after Mr. Dorian began his search, in July or August 1991, Mr. Cornner came to visit him at Hoover Imports. Mr. Cornner was an acquaintance of Mr. Dorian's. They had become acquainted many years before when both were car salesmen for separate automobile dealerships. Mr. Cornner represented to Mr. Dorian that he was the executive vice president of Cornner Armstrong Phinancial Services, Inc. ("CAPS") and was in the business of finding loans for persons who were unable to find loans through conventional means. This first meeting was apparently coincidental and not planned.[8]

Several days later Mr. Cornner returned to Mr. Dorian's place of business. On that occasion, he and Mr. Dorian discussed a transaction where Mr. Cornner would, in return for a fee, procure a business loan for Mr. Dorian. According to Mr. Dorian's testimony, Mr. Cornner told Mr. Dorian that Mr. Cornner could obtain a $1,000,000 line of credit for Mr. Dorian that would be unsecured by any of Mr. Dorian's then existing assets. According to Mr. Cornner's testimo-

---

7. While Mr. Cornner's attorney, who also represented Mr. Cornner at the trial of the other adversary proceeding, had no objection to admission of Mr. Dorian's testimony from the other trial in lieu of Mr. Dorian being called to the stand at the trial of this matter, he did object to the relevance and materiality of Mr. Dorian's testimony to the issues in this case. That particular objection will be discussed at footnote 10, below herein. In an effort to be fair, the narrative of the testimony from the other trial includes not only Dorian's account of his dealings with Mr. Cornner, but also Mr. Cornner's version of the events relating to his dealings with Mr. Dorian.

8. Cornner testified that based upon representations made to him by the "Armstrong" of Cornner *Armstrong* Phinancial Services, Inc., he believed *at the time of his dealings with Dorian* that CAPS was a corporation and that he owned half of the stock in the corporation, although he admitted that he never signed any documents relating to the incorporation. Plaintiff's Exhibit 3 in Adv.Pro. No. 94–00111 is a document from the Alabama Secretary of State certifying that there is no record of any corporation by that name.

ny, Mr. Dorian told Mr. Cornner that he wanted to explore the possibility of obtaining a loan for his business and asked Cornner if he thought that he could help him, and Mr. Cornner told Dorian that he believed that he knew some sources from which he could arrange a loan for Mr. Dorian. After that, Mr. Dorian met with Mr. Cornner five or six times at Hoover Imports, and had numerous telephone conversations with Mr. Cornner. According to Mr. Cornner, during one of those conversations, Mr. Cornner informed Mr. Dorian that "it would require a lot of phone calls and stuff like that to get it done and there would be a retainer charge to do it." Dorian called several references given to him by Mr. Cornner.

On August 6, 1991, Cornner gave a commitment letter to Mr. Dorian. Pla.Ex. 2 in Adv.Pro. No. 94–00111. The commitment letter specified that in the event Mr. Dorian gave CAPS a "retainer" by August 7 at 2:00 p.m., Mr. Cornner "personally guaranteed" that he would refund the retainer in full, if he had not procured a loan for Mr. Dorian within 20 days after receipt of the retainer. Mr. Dorian testified that Mr. Cornner gave him the commitment letter so that Mr. Dorian would give him the $5,000. Mr. Cornner testified that he gave Mr. Dorian the letter to let Mr. Dorian know that he was "not trying to hook or crook anyone."

Initially, Mr. Cornner asked for a retainer of $10,000 but Mr. Dorian was only willing to give him $5,000.[9] Mr. Dorian gave the initial $5,000 retainer to Mr. Cornner shortly after August 7, 1991. Mr. Cornner then ostensibly began to find a loan for Mr. Dorian. Mr. Cornner testified that he spoke to several companies in an effort to obtain a line of credit for Mr. Dorian, and that on 15 to 20 occasions he worked on Mr. Dorian's loan application by meeting with Mr. Dorian or making long distance phone calls to prospective lenders.

Dorian never received any money from CAPS or Mr. Cornner in the form of a loan or otherwise, nor did he receive a loan as a result of any efforts on the part of Mr. Cornner or CAPS. Mr. Dorian asked Mr. Cornner to return his $5,000.00 but Mr. Cornner would not. After the time limit specified in the commitment passed, and Mr. Dorian had not received a loan or his retainer back, Mr. Dorian met with Mr. Cornner five to eight times at Hoover Imports and had 30 to 50 phone conversations with Mr. Cornner, in an attempt to find out why the promised loan had not been made and why his retainer had not been returned. Mr. Dorian even visited Mr. Cornner's house on two or three occasions. During this time, Mr. Cornner continuously reassured Mr. Dorian that he was still trying to fund a loan, however, Mr. Dorian contends that Mr. Cornner never intended to provide him a loan within 20 days of his receipt of the retainer, and never intended to refund the retainer if the loan was not made within 20 days.

## II.  SECTION 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code makes nondischargeable a debt for obtaining money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretense, a false representation, or actual fraud. In order to preclude the discharge of a particular debt because of a debtor's false representation, a creditor must prove: 1) that the debtor made a false representation; 2) that at the time he knew the representation was false; 3) that he made the representation with the purpose and intention of deceiving the creditor; 4) that the creditor relied on the representation and his reliance was reasonably founded; 5) and, that the creditor sustained loss or damage as a result of the representation. *In re Hunter*, 780 F.2d 1577, 1578 (11th Cir.1986). In other words, "The debtor must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality." *Id. See also Neal v. Clark*, 95 U.S. 704, 5 Otto 704, 24 L.Ed. 586 (1887); *Gabellini v. Rega*, 724 F.2d 579

9. Dorian testified that he gave Cornner $5,000. On direct examination Cornner testified that Dorian paid him $5,000. On cross examination, Cornner stated that Dorian gave him between $2,500 and $5,000, but admitted that in a deposition previously given by him in this case he had testified that he had received $5,000 from Dorian.

(7th Cir.1984); *In re Pedrazzini,* 644 F.2d 756 (9th Cir.1981); *Massachusetts v. Hale,* 618 F.2d 143 (1st Cir.1980); *In re Preston,* 47 B.R. 354 (E.D.Va.1984); *In re Byrd,* 9 B.R. 357 (Bankr.D.D.C.1981); 124 Cong.Rec. 32399 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5787, 6436, 6453 (Statement of Representative Edwards).

### III. CONCLUSIONS OF LAW

■ Mrs. Porterfield contends that Mr. Cornner promised to provide her an arrangement where she could get her house back within 30 days of his receipt of the $4,000 or to refund the $4,000 in the event he was unable to make the necessary arrangements for her to get her house back. Mrs. Porterfield contends that at the time the promise was made, Mr. Cornner had the present intent not to perform.

■ A promise to perform an act in the future is a present representation and, if the promise is not ultimately performed, may constitute fraud if, at the time the promise was made, the defendant intended not to do the act promised and intended to deceive the plaintiff. *E & S Facilities, Inc. v. Precision Chipper Corporation,* 565 So.2d 54, 59 (Ala. 1990). Mr. Cornner did not arrange for Mrs. Porterfield to get her house back and did not refund Mrs. Porterfield's $4,000. "Although the mere failure to provide the promised support is not, by itself, sufficient to prove an intention to deceive or an intention not to perform, the jury may consider it in the context of other facts surrounding the promise." *Mason and Dixon Lines, Inc. v. Byrd,* 601 So.2d 68, 73 (Ala.1992).

This Court finds that Mr. Cornner's statement that he would return Mrs. Porterfield's $4,000 if he could not arrange to get her house back was false and made with the intent to deceive Mrs. Porterfield. The clear import of the written agreement that he provided Mrs. Porterfield was that he would not spend the money, but would place it for safekeeping and that the money would be "returned" to her if he was unable to make the necessary arrangements. By his own admission, he was "holding" the money which she paid him until, according to his testimony, she brought in the remaining $2,500.

When asked about the money paid to him by Mrs. Porterfield, Mr. Cornner stated "Okay, I was basically holding it, it was in a holding situation, your Honor, until she brought in the balance of the money." In fact, Mr. Cornner did not hold the money, but spent it.

The phrase "less expenses" in the agreement can only be interpreted as referring to expenses to be incurred. Mr. Cornner's testimony is clearly to the effect, however, that he used the money to reimburse himself and USA for expenses incurred prior to the date of the agreement. On that point, he stated "Although we had spent money in getting things done for them at that time we had not received any funds from them. USA Mortgage had spent funds, I had also spent some funds on my own because as far as some of the investors I deal with, they did not go directly through USA Mortgage because some of them didn't want to deal with them." If the money was already committed to the reimbursement of expenses already incurred, then it was impossible for Mr. Cornner, in the agreement, to have truthfully promised the return of the $4,000 if he could not save Mrs. Porterfield home.

Mr. Cornner's complete inability or refusal to account for the spent money, coupled with his unbelievable explanation for how the money was spent, leads this Court inexorably to the conclusion that he never intended to account for it, that he never intended to use the money to pay business expenses associated with Mrs. Porterfield's transaction, and that he never intended to give the money to an investor or lender. Those conclusions are further bolstered by the fact that Mr. Cornner was evasive and contradictory when he said that he gave half of the money to USA Mortgage. At trial, Mr. Cornner was given every opportunity to explain how the money was spent. After continuously avoiding the issue, he was asked "Then you had no intention of accounting to Mrs. Porterfield as to how you spent her money, did you?" He could only respond "Well I disagree with that." Then he was asked "If you didn't keep a record of how you were spending it, how could you?" Mr. Cornner's only response was "O.K., as far as you saying my

having intentions of not doing something, I disagree."

Mrs. Porterfield refused to give Mr. Cornner any money until he gave her written assurances. Mr. Cornner gave Mrs. Porterfield the agreement so that she would give him the money. Since he spent the money, he lacked the means, and apparently the intention, to return the money to her or to pay it to an investor or a lender. After spending the money, he engaged in evasive behavior toward Mrs. Porterfield, continuously reassuring her that completion of the necessary arrangements was imminent, that the deal would soon be closed. Even when Mrs. Porterfield confronted Mr. Cornner after the sheriff served her with an eviction notice, he still sought to convince her that he was still working on the deal. When asked about the money, he told her that it was in escrow and that he would give it back to her, seeking thereby to further delay her discovery of his fraudulent action.

The Court also finds that Mr. Cornner did not intend to help Mrs. Porterfield save her home, at least not when he provided her with the written agreement on February 16, 1993.

Mr. Cornner was unable to provide a coherent explanation of the steps taken by him to redeem Mrs. Porterfield's property from BancBoston. For the reasons already explained, no credit can be accorded his contention that he needed $6,500 for the investor or lender, especially since he testified that he spent the $4,000 paid to him by Mrs. Porterfield for other purposes. The story regarding the $6,500 is the cornerstone of his excuse for not doing what he promised he would do. Because that portion of his testimony is implausible, the remainder of his explanation regarding his efforts to secure someone to help Mrs. Porterfield is likewise implausible. Furthermore, his evasive conduct, by reassuring Mrs. Porterfield to the bitter end that a deal was in the offing, lends additional support for the conclusion that Mr. Cornner's promise to arrange for Mrs. Porterfield to get back her home was merely part of the fraudulent scheme.

Mr. Cornner's intent to deceive Mrs. Porterfield is supported by the fact that he deceived Mr. Dorian in substantially the same fashion.[10] Mr. Cornner told Mr. Dorian that he would return his money if he did

---

**10.** Federal Rule of Evidence 404(b) allows the admission of evidence of other wrongs to prove intent. Such evidence of similar acts are admissible under the rule if: "1) they are relevant to an issue other than the defendant's character; 2) there is clear and convincing evidence that the defendant committed the other similar acts; and 3) any potentially unfair prejudice of the evidence does not substantially outweigh its probative value." *In re Kroh,* 88 B.R. 987, 988 (Bankr. W.D.Mo.1988) (citations omitted). The admissibility of evidence of similar acts to show intent is accepted in this circuit. See, *Jones v. Childers,* 18 F.3d 899, 913 (11th Cir.1994); *See also, Dial v. Travelers Indemnity Co.,* 780 F.2d 520, 523 (5th Cir.1986). Based on the above test, the Court finds that: 1) the Porterfield testimony does not relate to Cornner's character and is relevant to intent; 2) there is clear and convincing evidence that Cornner committed the similar acts; and 3) the unfair prejudice of the evidence against Cornner does not substantially outweigh its probative value.

The reason for allowing such evidence is clear. The perpetrator of fraud is, most often, the sole possessor of actual knowledge of such fraud. Great latitude is thus allowed in admitting evidence on the issue of alleged fraud and undue restriction should not be placed on the introduction of evidence which has probative value, however slight, on this issue. *Mid–State Homes, Inc. v. Johnson,* 294 Ala. 59, 63, 311 So.2d 312, 315

(1975). Also, since present intent not to perform a future act is difficult to prove by direct evidence of a defendant's state of mind, a plaintiff may meet this burden by circumstantial evidence. *Marshall Durbin Farms, Inc. v. Landers,* 470 So.2d 1098, 1101 (Ala.1985).

Generally speaking, evidence of similar fraudulent acts is admissible to show a fraudulent intent, plan, or scheme, provided that the acts meet the requirements of similarity in nature and proximity in time. Gamble, McElroy's Alabama Evidence § 70.03(1), pages 215–216 (4th ed. 1991). Specifically, and even more to the point in this case, evidence of other similar failures to perform may be considered to establish that a defendant never intended to perform a promise made. *Baker v. State,* 588 So.2d 945, 947 (Ala. Crim.App.1991); *Benefield v. State,* 469 So.2d 699, 701 (Ala.Crim.App.1985).

In *Baker,* Baker contracted to reroof the Terrells' house for $1,200. The money was paid up front. Baker took off the old roof and removed much of the underlying wood, claiming it would have to be replaced, but did not place a new roof on the house as he had promised. Baker was charged criminally with violating Ala.Code § 13A–8–2, which provides that a person commits the crime of theft of property if he "[k]nowingly obtains by deception control over the property of another, with intent to deprive the owner of his property." Under that code provision, deception occurs when a defendant knowingly

not find him a loan within 20 days. Mr. Cornner, in fact, neither found Mr. Dorian a loan nor returned his money. He instead spent Mr. Dorian's money and cannot recall exactly how he spent it, except to say that he spent most of it on an unspecified number of long distance phone calls and faxes. When Mr. Dorian repeatedly asked for his money back, Mr. Cornner continuously reassured Mr. Dorian that he was still trying to get the loan funded.

"[p]romises performance which the defendant does not intend to perform or knows will not be performed," but "[f]ailure to perform, standing alone ... is not proof that the defendant did not intend to perform." Ala.Code § 13A-8-1(1)(f). Baker contended that the prosecution did not prove a case of theft of property by deception because more than mere failure to perform a promise is required to support an inference of deceptive intent. One of the Baker's prior clients testified that he had not performed the remodeling work on her house as he had promised, despite her advance payment to him of $2,160. The court held that the jury could infer that Baker never intended to perform the contract to reroof the Terrells' house from his failure to perform the initial contractual promise, when combined with his failure to perform the contractual promise to remodel his prior client's home and his failure to perform repeated subsequent assurances regarding the contract to the Terrells. Baker's debt to the Terrells would be nondischargeable in bankruptcy. *See In re Raiford*, 695 F.2d 521 (11th Cir.1983) (debtor's conviction of bankruptcy crime precluded relitigation of factual issues in common between criminal statute and bankruptcy statute permitting denial of discharge where a debtor knowingly and fraudulently makes a false oath or account in connection with the bankruptcy proceeding).

Mr. Cornner's failure to perform the promise to Mr. Dorian may be considered by this Court to establish that he never intended to perform the similar promise made to Mrs. Porterfield. The fraud committed on Mr. Dorian is virtually the same as that committed on Mrs. Porterfield. Mr. Cornner obtained money up front from both, which was unusual in itself, since he testified that he ordinarily received as compensation a percentage fee from the loan proceeds at closing. He promised both that he would either obtain a loan or return their money within 20–30 days. He did not obtain a loan for either Mr. Dorian or Mrs. Porterfield and did not return either's money. He spent the money paid to him by each of them and has no plausible explanation as to how the money was spent in either instance. In each instance, Mr. Cornner subsequently engaged in delay and evasive tactics, reassuring both Mr. Dorian and Mrs. Porterfield on numerous occasions that the completion of the promised transaction was imminent.

## IV. CONCLUSION

Based on the foregoing, the Court finds that the judgment rendered on behalf of Mr. and Mrs. Porterfield against Mr. Cornner by the Circuit Court of Jefferson County, Alabama, in Civil Action No. 93–1945, is a debt which, pursuant to 11 U.S.C. § 523(a)(2)(A), is not dischargeable in bankruptcy.[11] A separate order and judgment will be entered in accordance with this memorandum opinion.

Under the Alabama cases, the fraud committed by Mr. Cornner on Mr. Dorian cannot be said to have been so remote in time to the fraud committed on Mrs. Porterfield as to be immaterial to the question of intent in this case. The fraud against Porterfield occurred in December 1992 or January 1993; approximately one year and four or five months after the fraud against Dorian. In *Shoals Ford, Inc. v. McKinney*, 605 So.2d 1197 (Ala.1992), the Alabama Supreme Court held that testimony concerning other fraudulent acts of an automobile dealer was admissible even though the other acts occurred five months before and nine months after the fraud at issue in that case. In *Harris v. M & S Toyota, Inc.*, 575 So.2d 74 (Ala.1991), the court held that the plaintiff could introduce evidence regarding the settlement of a similar fraud claim filed against the defendant by another person two years before the fraud at issue in that case. In *Davis v. Davis*, 474 So.2d 654 (Ala.1985), the court upheld the admission by the trial court of evidence of a similar misrepresentation made by the defendant to a third person ten years after the alleged misrepresentation was made to the plaintiff in that case.

11. The issue of dischargeability is unaffected by the state court judgment. The judgment entered was a default judgment, and in Alabama, it is doubtful that a default judgment has any collateral estoppel effect. *See Smith v. Union Bank & Trust Co.*, 653 So.2d 933 (Ala.1995) (dismissal without prejudice of plaintiff's lawsuit for failure to amend complaint would not be given collateral estoppel effect in subsequent action brought by plaintiff against same defendant); *AAA Equipment & Rental, Inc. v. Bailey*, 384 So.2d 107 (Ala.1980) (stipulated judgment entered against codefendants did not operate as estoppel upon subsequent action by one of codefendants against other codefendants). *See also In re Booth*, 174 B.R. 619, 623 (Bankr.N.D.Ala.1994) ("The law in Alabama ... is that neither a *consent* judgment nor a *default* judgment can satisfy the 'actually litigated' element.") *Id.* (emphasis in original) (citations omitted).

On the other hand however, as to the issue of damages, the state court judgment is res judicata as to the validity and amount of the debt. *Matter of Dennis*, 78 B.R. 1012, 1017 (Bankr.N.D.Ala. 1987) (state court, civil fraud judgment is res

***ORDER AND JUDGMENT***

In conformity with and pursuant to the Memorandum Opinion entered contemporaneously herewith, it is **ORDERED, ADJUDGED AND DECREED** that:

1. Judgment is entered for the Plaintiffs and against the Defendant;

2. Judgment rendered on behalf of the Plaintiffs against the Defendant by the Circuit Court of Jefferson County, Alabama, in Civil Action 93–1945 is not dischargeable in bankruptcy.

judicata as to amount but not dischargeability); *In re Reitz,* 69 B.R. 192, 198 (N.D.Ill.1986); *Martino v. Brown,* 34 B.R. 116, 117 (D.N.M.1983); *In re Mason,* 175 B.R. 299, 303 (Bankr.W.D.Mo. 1994); *In re Neely,* 125 B.R. 392, 395 (Bankr. S.D.N.Y.1991); *In re Gibbs,* 107 B.R. 492, 496 (Bankr.D.N.J.1989); *In re Morton,* 100 B.R. 607, 612 (Bankr.N.D.Ga.1989); *In re Hogan,* 47 B.R. 124, 126 (Bankr.W.D.Wis.1985), even though it was entered by default. *In re Comer,* 723 F.2d 737, 740 (9th Cir.1984); *In re Adams,* 147 B.R. 407, 418 fn. 27 (Bankr.W.D.Mich.1992); *In re Sullivan,* 122 B.R. 720, 723 (Bankr.D.Minn. 1991); *In re Holt,* 102 B.R. 116, 119 (Bankr. S.D.Ohio 1989); *In re Brown,* 56 B.R. 954, 959 (Bankr.E.D.Mich.1986); *In re Moccio,* 41 B.R. 268, 272 (Bankr.N.J.1984). *See also Ex parte*

*State of Alabama ex rel. V.E.T.P.,* 646 So.2d 551, 552 (Ala.1993) (default judgment has res judicata effect); *McDonald v. U.S. Die Casting & Dev. Co.,* 628 So.2d 433, 434 (Ala.1993) (default judgment has res judicata effect).

There were allegations that a similar judgment was entered against Mr. Cornner in the state court suit brought against him by Mr. Dorian. Mr. Dorian did not, however, offer into evidence the complaint filed by him in state court, or the actual judgment rendered by the state court, or any other portion of the record in the state court case from which this Court could have determined the factual basis of the state court judgment; consequently there could be no preclusive effect given the amount of that judgment in Mr. Dorian's adversary proceeding.